FILED

## IN THE UNITED STATES DISTRICT COURT ꟼꟼ 3:40
## MIDDLE DISTRICT OF FLORIDA
## JACKSONVILLE DIVISION

PINKNEY CARTER

       *Petitioner,*

v.

       Case No.: 3:15-cv-1198-J-39PDB
       L.T. No.:  16-2004-CF-730

JULIE L. JONES

       *Respondent,*
_____/

## PETITION FOR WRIT OF HABEAS CORPUS BY A PERSON IN STATE CUSTODY, UNDER 28 U.S.C. § 2254 WITH REQUEST FOR LEAVE TO AMEND

    Prisoner's Name:      Pinkney Carter

    Prisoner's Number:    127513

    Place of Confinement:   Union Correctional Institution, Raiford Florida

Submitted by:

**FRANK TASSONE, ESQUIRE**
Fla. Bar No.: 165611
1833 Atlantic Blvd
Jacksonville FL 32207
P: (904) 396-3344
F: (904) 396-0924
Attorney for Petitioner

## INTRODUCTION

This petition is filed pursuant to 28 U.S.C § 2254.  At present, PINKNEY CARTER, Petitioner, is confined by the State of Florida, under various judgments, at the Union Correctional Institution in Raiford, Florida.  Mr. Carter's date of birth is August 22, 1954; his Dept. of Corrections I.D. No. is 127513.  The judgments of conviction and sentence at instant issue arise out of the Fourth Judicial Circuit Court in and for Duval County, where on October 14, 2005 Petitioner was sentenced to death, amongst other sentences, by the Honorable Lance Day, Circuit Court Judge.  The Florida Supreme Court affirmed the decision of the trial court February 14, 2008.

In violation of the 6th, 8th, and 14th Amendments to the Constitution of the United States, Petitioner has been denied a fair and impartial trial by jury and the due processes and equal protection of the law and is being unlawfully confined.

## RECORD REFERENCES

The following Record References will be used in this Petition: "__ R ___" will refer to the trial transcripts in and for this case, while "_ SR ___" will refer to the 3.851 Supplemental Record on Appeal before the Florida Supreme Court. Furthermore, exhibits attached to this Petition shall be in the form of an Appendice, and will be referenced in this Petition as: "Exhibit __).

2

## STANDARD OF REVIEW

As this Court will review whether the state court's decision is directly contrary to the United States Supreme Court's case law, the standard of review is *de novo. Van Poyck v. Fla. Dep't of Corr.*, 290 F.3d 1318, 1321 (11th Cir. 2002) (quoting *Harrell v. Butterworth*, 251 F.3d 926, 930 (11th Cir. 2001)).

## PROCEDURAL HISTORY

Mr. Carter's indictment occurred January 15, 2004, for three counts of first-degree murder for the deaths of Glen Pafford, Elizabeth Reed, and Courtney Smith. *Carter v. State*, 980 So. 2d 473, 479 (Fla. 2008). Though the crime occurred in July of 2002, Mr. Carter's arrest did not occur until January 2004, and the trial followed September 2005. (Order Den. Def.'s Mot. for Postconviction Relief 1).[1] A jury found Mr. Carter guilty of all three counts of murder September 27, 2005. *Carter*, 980 So. 2d at 479.

The jury recommended a death sentence for Mr. Carter by a 9-3 vote for the death of Elizabeth Reed; 8-4 vote for the death of Glenn Pafford; and a life sentence for the death of Courtney Smith. *Id.* The Florida Supreme Court affirmed Mr. Carter's convictions and sentences on direct appeal. *Id.* at 473. The United States Supreme Court then denied certiorari, which made Mr. Carter's convictions final. *Carter v. Florida*, 555 U.S. 947 (2008).

---

[1] References to the circuit court's Order Denying Defendant's Motion for Postconviction Relief will hereafter be cited to "Order [page]."

Mr. Carter moved to vacate his conviction and sentence on October 13, 2009, and the State filed its response on December 21, 2009. (Order 1). After Mr. Carter filed his Amended Motion to Vacate Judgments of Conviction and Sentence and the State filed its Answer, the court held an evidentiary hearing on Claims One, Three, Four, part of Claim Five, and Claim Nine on August 1, 2012 and September 24, 2012. (Order 3-4). After both the State and Mr. Carter filed post-evidentiary hearing memorandums, the Circuit Court denied Mr. Carter's claim for postconviction relief March 28, 2013. A notice of appeal to the Florida Supreme Court followed and on July 2, 2015, the Florida Supreme Court denied postconviction relief. *Carter v. State*, 40 Fla. L. Weekly S404 (Fla. 2015).

## GROUNDS FOR RELIEF

## CLAIM ONE

**THE FLORIDA SUPREME COURT ERRED BY HOLDING THAT THE UNITED STATES SUPREME COURT'S DECISION IN *RING V. ARIZONA*, 536 U.S. 584 (2002) HAS NO APPLICABILITY TO FLORIDA'S DEATH SENTENCING SCHEME AND NOT REQUIRING A UNANIMOUS JURY RECOMMENDATION OF DEATH.**

The Florida Supreme Court rejected Carter's *Ring* claim because a unanimous jury convicted Carter on each count. *State v. Carter*, 980 So. 2d 473, 484-85 (Fla. 2008). On the other hand, the jury recommended the death for the murder of Pafford by a vote of nine to three, death for the murder of Reed by a

vote of eight to four, and life imprisonment for the murder of Smith. *Id.* at 479. Ultimately it was the court (not the jury) that imposed the death sentences. *Id.*

In Florida, the court holds a separate sentencing hearing at which the jury determines whether sufficient mitigating circumstances exist which outweigh the aggravating circumstances. Fla. Stat. § 921.141(2)(b) (2015). Regardless of the jury recommendation, the court has the authority to weigh the circumstances on its own and sentence a defendant to life or death. § 921.141(3). Based on how the United States Supreme Court has addressed Florida's death sentencing scheme, this Court should find that Florida death sentencing scheme is in violation with *Ring*.

In *Proffitt v. Florida*, 428 U.S. 242 (1976) the United States Supreme Court addressed Florida's death penalty scheme and held that judicial sentencing leads to greater consistency in the imposition of punishment. *Proffitt*, 428 U.S. at 252. The Court concluded that trial judges have more experience in sentencing and are better apt to impose capital sentences. *Id.* *Ring* specifically rejected this argument by stating that the Sixth Amendment right to a jury trial does not trigger "rationality, fairness, or efficiency." *Ring*, 536 U.S. at 607. While it may be true that judges

have more experience, the founders adopted the Sixth Amendment because they feared leaving a criminal defendant's rights and liberties in the hands of the judge.[2]

The Court in *Ring* relied on its decision in *Aprendi v. New Jersey*, 530 U.S. 466 (2000) where the Court held that a legislature could not "remove the jury from determination of a fact that, if found, exposes the criminal defendant to a penalty exceeding the maximum he would receive if punished according to the facts reflected in jury verdict alone." *Aprendi*, 530 U.S. at 482-83. The Court relied on the historical background and noted that the right to a trial by jury has always required that "the truth of every accusation, whether preferred in the shape of indictment, information, or appeal, should afterwards be confirmed by the unanimous suffrage of twelve equals and neighbours." *Id.* at 477 (quoting 4 WILLIAM BLACKSTONE, COMMENTARIES ON THE LAWS OF ENGLAND 343 (1769)).

*Ring* requires any fact that qualifies a capital defendant for a sentence of death to be found by a jury. *Hurst v. State*, 147 So.3d 435, 450 (Fla. 2014) (Pariente, J., concurring in part and dissenting in part). Justice Pariente stated further, "Article 1, Section 22, of the Florida Constitution 'requires a unanimous jury finding beyond a reasonable doubt on the existence of any element necessary to increase an authorized punishment, most specifically the ultimate punishment of

---

[2] *See* Welsh S. White, Note, *Fact-Finding and the Death Penalty: The Scope of a Capital Defendant's Right to Jury Trial*, 65 NOTRE DAME L. REV. 1, 3 (1989).

the death penalty.'" *Id.* (quoting *Butler v. State*, 842 So. 2d 817, 838 (Fla. 2014)).

Since a unanimous jury should confirm every accusation, Florida's death penalty

scheme is unconstitutional.

## CLAIM TWO

**CARTER'S EIGHTH AND FOURTEENTH AMENDMENT RIGHTS WERE VIOLATED WHEN THE STATE COURT RULED THAT THEIR DECISION WAS SOLELY A RECOMMENDATION**

Before the penalty phase jury heard any testimony regarding what

aggravating and mitigating factors existed, after the jury heard all the evidence, the

court instructed the jury that their decision was solely a recommendation. (3 R

425, 6 R 10744-75). Although Carter objected to the jury instructions, the state

court denied the complaint. (3 R 429). The State court violated Carter's Eighth

and Fourteenth Amendment Rights as the State court's decision is contrary to

United States Supreme Court's decision in *Caldwell v. Mississippi*, 472 U.S. 320

(1985).

In *Caldwell*, the State sought to minimize the jury's sense of responsibility

by implying that their decision was solely a recommendation. *Caldwell* at 326-26

("Assistant District Attorney . . . 'the decision your render is automatically

reviewable by the Supreme Court'"). The Court held that it is a violation of the

Eighth Amendment to rest a death sentence on a determination made by a jury who

has been led to believe that the responsibility for determining the appropriateness of the defendant's death rests elsewhere. *Id.* at 328.

The Florida Supreme Court rejected Carter's argument on the *Caldwell* decision by citing to *Rodriguez v. State*, 919 So. 2d 1252, 1280 (Fla. 2005); *Thomas v. State*, 838 So. 2d 535, 541 (Fla. 2003); *Burns v. State*, 699 So. 2d 646, 654 (Fla. 1997); and *Sochor v. State*, 619 So. 2d 285, 291-92 (Fla. 1993). *Carter v. State*, 980 So. 2d 473, 485 (Fla. 2008). The problem lies in the fact that the Florida Supreme Court in *Rodriguez*, *Thomas*, and *Sochor* dismissed the jury instruction argument because it was not objected to during the trial.[3] Furthermore, the Florida Supreme Court in *Burns* dismissed the *Caldwell* claim by relying on the Court's decision in *Espinosa v. Florida*, 505 U.S. 1079 (1992). *Burns* at 654. However, the Court in *Espinosa* never addressed the Court's decision in *Caldwell*.

In conclusion, the Florida Supreme Court erred in dismissing Carter's *Caldwell* claim because it lacked merit. Carter did object to the trial court's jury instruction and the objection had merit because the jury instructions violated Carter's Eighth Amendment rights.

---

[3] "Rodriguez has failed to demonstrate that trial counsel's performance was deficient and there is a reasonable probability that the result would have been different had trial counsel objected to the jury instructions in question." *Rodriguez v. State*, 919 So. 2d 1252, 1280 (Fla. 2005); "Thomas claims that the circuit court erred in rejecting his claim that trial counsel was ineffective in failing to object." *Thomas v. State*, 838 So. 2d 535, 541 (Fla. 2003); "Further, Sochor did not raise this claim at trial. Thus, it has not been preserved for review." *Sochor v. State*, 619 So. 2d 285, 292 (Fla. 1993).

## CLAIM THREE

**THE FLORIDA SUPREME COURT ERRED IN CONCLUDING THAT TRIAL COUNSEL DID NOT RENDER INEFFECTIVE ASSISTANCE BY FAILING TO CALL A MENTAL HEALTH EXPERT DURING THE PENALTY PHASE OR SPENCER HEARING TO ESTABLISH THE EXISTENCE OF TWO STATUTORY MITIGATORS, DISPROVE ONE STATUTORY AGGRAVATOR, AND PUT MR. CARTER NON-STATUTORY MITIGATORS IN A PROPER PSYCHOLOGICAL FRAMEWORK.**

The purpose of the constitutional guarantee to effective assistance is to ensure that criminal defendants receive a fair trial. *Strickland v. Washington*, 466 U.S. 688, 689 (1984). To establish ineffective assistance of counsel, the defendant must satisfy both prongs of the test outlined in *Strickland*. A convicted defendant's claim that counsel's assistance was so defective as to require reversal of a conviction or setting aside of a death sentence requires the defendant to show that: (1) counsel's performance was deficient, and (2) counsel's deficient performance prejudiced the defense so as to deprive the defendant of a fair trial. *Id.* at 669. Unless a defendant satisfies both prongs, it cannot be said that the conviction or sentence of death resulted from a breakdown of the adversary process that renders the result unreliable. *Id.*

In order to show that counsel's performance was deficient, the defendant is required to prove that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed by the Sixth Amendment. *Id.* at 687 (emphasis added). In determining whether performance was deficient, courts ask whether the attorney's performance was reasonable considering all the

9

circumstances. *Id.* at 688. Further, "a court deciding an actual ineffectiveness claim must judge the reasonableness of counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct." *Id.* at 690. The defendant must also overcome the presumption that counsel's actions, which are challenged as deficient, might be considered sound trial strategy under the circumstances. *Id.* at 691.

To prove a defendant was <u>prejudiced</u> by counsel's deficient performance, the defendant must show that counsel's errors were "so serious as to deprive the defendant of a fair trial, a trial whose result is unreliable." *Id.* at 687 (emphasis added). In challenging a death sentence, the question is whether there is a reasonable probability that, absent counsel's errors, "the sentencer . . . would have concluded that the balance of aggravating and mitigating circumstances did not warrant death." *Id.* at 695. A "reasonable probability" is not of an absolute certainty, but a probability sufficient to undermine confidence in the outcome. *See Sims v. State*, 602 So. 2d 1253, 1256 (Fla. 1992). Although some errors will have had an "isolated trivial effect," some errors will have had a "pervasive effect on the inferences to be drawn from the evidence, altering the entire evidentiary picture . . . ." *Strickland*, 466 U.S. at 695-96.

## A.   DEFICIENT PERFORMANCE

Mr. Carter's trial counsels, Al Chipperfield and William White, were deficient under *Strickland* for failing to use a mental health expert to testify about risk and protective factors.  Though counsel presented witness testimony about Mr. Carter's horrible childhood, counsel did not present an expert to properly explain Mr. Carter's experiences and neurological impairment during penalty phase. Further, counsel never considered presenting an expert to testify about Mr. Carter's risk and protective factors, so failing to present such an expert was not "sound trial strategy" protected under *Strickland*, 466 U.S. at 691.

Additionally, counsel presented Mr. Carter as a "good guy who did a horrible thing" during penalty phase despite knowing that the State was arguing for three statutory aggravators.  Counsel should have been aware of—or simply disregarded—the vast amount of case law illustrating the strength of statutory aggravating factors and statutory mitigating factors in death penalty cases, and counsel chose to present non-statutory mitigation that gave Mr. Carter no likelihood of a life sentence.

### 1.   Counsels' Decision Not to Have a Mental Health Expert Testify During Mr. Carter's Penalty Phase Was Not "Strategy"

Defense counsel had a mental health expert conduct a mental evaluation of Mr. Carter, which revealed neurological impairment and insight into the scientific effect of Mr. Carter' traumatic childhood on his life. *Letter from Dr. Harry Krop*

11

*to Al Chipperfield, Esq. Regarding Neuropsychological Evaluation of Pinkney Carter* (Oct. 27, 2004) (on file with undersigned counsel). Despite this, counsel opted against having a mental health expert testify about these findings for two reasons: (1) counsel did not think the findings from the evaluation would "be that helpful" to them; and (2) counsel thought cross-examination of the mental health expert would most likely reveal an incident with Mr. Carter's ex-wife that counsel thought would be harmful to Mr. Carter in the eyes of the jury and the court.[4] (Hr'g Vol. I 22-26).

Though sometimes trial counsel's challenged actions might be considered "sound trial strategy," *Michel v. Louisiana*, 350 U.S. 91 (1955), alternate courses must be considered and rejected in order to be protected from an ineffective assistance of counsel claim. *See Occhione v. State*, 768 So. 2d 1037, 1048 (Fla. 2000). Although the State argued that the decision not to use testimony of a mental health expert was "strategic," both Mr. Chipperfield and Mr. White admitted they did not consider acquiring a mental health expert to specifically identify risk and protective factors in Mr. Carter's life in order to explain to the jury how risk and protective factors affect individuals. (Hr'g Vol. I 47, 78; Vol. II 251).

---

[4] Mr. Carter acted out a sexual fantasy of his with his ex-wife (they were separated at the time) by arriving to her house uninvited and having sexual intercourse with her with a mask on. She did not know it was him until 30 minutes later. (Hr'g Vol. I 154). Mr. Carter was also charged with aggravated assault after a fight in a pool hall. *Id.* at 155-56.

Under *Occhione*, a mental health expert's analysis of risk and protective factors was not "an alternative considered and rejected" by defense counsel; therefore, counsel's decision not to call such an expert cannot be considered "strategic." Further, "counsel's failure to attempt to obtain reasonably available mitigating evidence from available sources precludes the State's argument that counsel reasonably chose against advancing the potentially detrimental testimony presented at the evidentiary hearing." *Walker v. State*, 88 So. 3d 128, 141-42 (Fla. 2012).

Though the circuit court incorrectly believed that expert testimony on risk and protective factors was part of counsel's strategic calculation because counsel actually "considered those factors when gathering mitigation and those factors were alluded to . . .", the court missed the meaning of risk and protective factors. (Order 35). Though counsel presented some testimony about Mr. Carter's troubling childhood, counsel provided no testimony regarding Mr. Carter's neurological issues, and counsel admitted that they did not consider putting Mr. Carter's mitigation into a framework to provide a scientific explanation for his actions. (Hr'g Vol. II 273-74). An expert's testimony on risk and protective factors would have provided this framework.

Counsel considered presenting a mental health expert to testify about Mr. Carter's past experiences and neurological impairment, but counsel rejected this

idea because a mental health expert would have revealed "negative information."
(Hr'g Vol. I 50).  Counsel was deficient because they ended the inquiry here—
when expert testimony about risk and protective factors was available.  Having
been convicted of three counts of first degree murder, the strategic decision to
present Mr. Carter as a good guy was flawed at best and deadly at worst.  Defense
counsel's failure to utilize a mental health expert to testify to Mr. Carter's risk and
protective factors during the penalty phase cannot be considered "sound trial
strategy" because defense counsel did not consider this method of approach.

The Florida Supreme Court agreed with the Circuit Court denying relief on
this claim finding that although the experts retained by trial counsel were not
presented at trial, the substance of the risk and protective factors such as family's
history, mental history, social history, education history, and schooling history,
was contained in the lay witnesses testimony in the penalty phase.  *Carter v. State*,
No. SC13-1076, 2015 WL 3999182, at *6 (Fla. July 2, 2015).  Carter's life should
not depend by only lay witnesses.  A lay witness may be able to describe Carter's
life but not explain to a jury that Mr. Carter was under the influence of extreme
mental or emotional disturbance.[5]  By not using an expert witness at the hearing,
trial counsel was deficient in Mr. Carter's case.

---

[5] "A lay witness may be able to testify that a factory's handling of chemicals was 'sloppy' but
not that it 'fell below industry norms.'" Robert J. Shaughnessy, Esq., *The Value of an Expert*

### B.   PREJUDICE

The Florida Supreme Court has previously explained how penalty phase prejudice is evaluated under the *Strickland* standard:

> In assessing prejudice, we reweigh the evidence in aggravation against the totality of the mental health mitigation presented during the postconviction evidentiary hearing to determine if our confidence in the outcome of the penalty phase trial is undermined. . . . .

*Hurst v. State*, 18 So. 3d 975, 1013 (Fla. 2009) (quoting *Hannon v. State*, 941 So. 2d 1109, 1134 (Fla. 2006)). In order to properly evaluate prejudice in Mr. Carter's case, the first section of Mr. Carter's prejudice argument is a summary of Dr. Gomez's testimony at the evidentiary hearing. This testimony illustrates how a mental health expert could have strengthened Mr. Carter's penalty phase mitigation and changed his sentence from death to a life sentence.

*1.    Summary of Dr. Gomez's Findings Regarding Mr. Carter's Neurological Health and the Effects of Risk and Protective Factors on Mr. Carter's Life.*

At the evidentiary hearing, Dr. Francisco Gomez, an expert in forensic psychology and forensic neuropsychology, gave a summary of his diagnosis of Mr. Carter. Dr. Gomez evaluated Mr. Carter through three primary methods: (1) acquiring third-party information; (2) a clinical and psychodiagnostic interview to

---

*Witness*, Though Leadership Article, Summer 2010,
http://www.willamette.com/insights_journal/10/summer_2010_1.pdf.

discover any outward symptoms; and (3) a number of common evaluative psychological tests.[6] (Hr'g Vol. I 96-108). Through these evaluations, Dr. Gomez found that Mr. Carter was emotionally immature, had hyperactive traits, and exhibited poor insight into his behavior. *Id.* at 109-11.

Dr. Gomez spoke of his involvement in a federally funded program to identify the effect of risk and protective factors on "problem behaviors." (Hr'g Vol. I 112-19). Those problem behaviors are violence, criminality, drug use, involvement with gangs, and impulsive behaviors. *Id.* at 112. The Department of Justice initiated the program to research how much traumatic events, society, environment, and poverty affects the likelihood of a person getting into trouble. *Id.* The results of these studies led to "individual risk factors." *Id.* at 111-113. Individual risk factors are broken down into five areas: (1) individual risk factors; (2) family risk factors; (3) school risk factors; (4) peer risk factors; and (5) community risk factors. *Id.* at 113.

Some risk factors are substantially more impactful than others, and the essential questions become, "what are the things that put you at risk, and what are the things that protect you from getting in trouble?" *Id.* at 114. This question led

---

[6] These tests include an I.Q. test; a reading and writing achievement test to determine if someone has a learning disability; a sensory field test; a grooved pegboard test to determine motor strength; a complex figure drawing test; a verbal fluency test; a Ruff Figural Fluency test; a Delis-Kaplan Trail Making test; the California Verbal Learning test; the Wisconsin card sort test; the MCMI-III; and the MCMI-2 test. (Hr'g Vol. I 96-108).

to the development of a "risk and protective model." *Id.*[7] Though the study of risk and protective factors is evolving to this day, Dr. Gomez stated that the first report detailing this study was done in 1993. *Id.* at 115. In their simplest form, risk and protective factors mean that the more risk factors you have, the more likely you are to get in trouble; if you have more protective factors, then you are less likely to get in trouble—no matter how many problems you have. *Id.* Dr. Gomez evaluated Mr. Carter's individual risk and protective factors, and the following is a summary of Dr. Gomez's findings—findings that a mental health expert could have testified about at Mr. Carter's penalty phase or *Spencer* hearing.

Dr. Gomez found that Mr. Carter had neurological impairment in problem solving. *Id.* at 20. When Mr. Carter is confronted with emotionally charged situations or is under stress, he acts impulsively. *Id.* Mr. Carter has a hyperactive disposition, which is a risk factor that has great impact. *Id.* People with hyperactivity have a three times higher rate of being involved in problem behaviors, such as violence and alcohol. *Id.* at 121. Mr. Carter had mild behavioral problems when he was younger, mostly due to a lack of supervision. *Id.* Dr. Gomez further stated that Mr. Carter had complex emotional trauma in his childhood because of the abandonment of his father, domestic violence, witnessing

---

[7] Test developed by the Department of Justice.

violence, and witnessing his stepfather abuse alcohol. *Id.* at 123. Complex trauma has a big impact on brain development and exacerbates risk factors. *Id.* at 122-23.

Generally, a clinician assesses for malingering[8] when an individual may have either a conscious and goal-directed reason for appearing psychologically impaired or minimizing psychological impairment. *See Philips v. State*, 984 So. 2d 503 (Fla. 2008) (finding that defense experts did not perform a complete evaluation of the defendant who was claiming mental retardation because the experts did not test for malingering). Dr. Gomez found nothing to indicate that Mr. Carter was malingering. *Id.* at 108. In fact, Mr. Carter was defensive, and "unwilling to endorse a lot of symptoms." *Id.* at 109.

Dr. Gomez then testified about Mr. Carter's family risk factors. Mr. Carter had the family risk factors of child maltreatment, poor family management, low levels of parental involvement, family conflict, and residential mobility. (Hr'g Vol. 1 123-27). Mr. Carter also had two of the heavier-weighted family risk factors: (1) parental attitudes favorable to substance abuse or violence; and (2) parental child separation (his father left when he was very young). *Id.* at 126-27. Mr. Carter's school risk factors were academic failure and frequent school transitions. *Id.* at 127-28. Dr. Gomez did not find any peer-related risk factors,

---

[8] *"Malingering* is the purposeful production of falsely or grossly exaggerated complaints with the goal of receiving a reward." PSYCHOLOGY TODAY, http://www.psychologytoday.com/conditions/malingering (last visited July 24, 2013) (emphasis added).

noting that Mr. Carter was not involved in gangs or violence, and never had difficulty making friends. *Id.* at 128. Lastly, Dr. Gomez found that Mr. Carter had the heavily-weighted community risk factor of poverty. *Id.* Dr. Gomez then measured Mr. Carter's risk factors against his protective factors, and detailed those findings in his report.

After explaining individual risk factors, Dr. Gomez expounded on "comorbid risk factors." "[They] are things that happen co-occurring. The 'co' means happening together, so what's comorbid would be someone who's got depression, and then the comorbid disorder is drug abuse." *Id.* at 133. Dr. Gomez then illustrated how comorbid risk factors applied to Mr. Carter:

> Well, first he had an underlying disability with his neurological impairments and then his personality disorder he had that made him very impulsive. He didn't think things out ahead of time . . . he had those problems. He had a lot of rage from his abandonment from the father, and so any time he was going to be abandoned he became very rageful and very out of control. As long as he left them it was fine and he was in control, but when they left him and he wasn't in control of it that's when he became . . . jealous or controlling, so he had the underlying disability. And then when you put that along with his suffering from depression, he had periods where his depression would increase, alcohol abuse, lack of sleeping and then what we call an emotionally charged situation then his risk factors, his risk for acting aberrantly go way up at that moment.

*Id.* at 133-34. Dr. Gomez found that Mr. Carter's criminal conduct was related to the combination of his risk and lack of protective factors. *Id.* at 130. Indeed, Dr. Gomez believes that the life of an individual is shaped by a combination of his or

19

her risk and protective factors. *Id.* at 116. Mr. Carter had a significant number of risk factors for violence, and if the right number of situational factors were in play, he could act aggressively. By putting Mr. Carter's experiences into a "risk and protective model," a mental health expert like Dr. Gomez could have compiled all his findings, and explained them to a jury or to the court.

2. *A Mental Health Expert's Testimony About Risk and Protective Factors Would Have Established Two Statutory Mitigating Factors and Disproved One Statutory Aggravating Factor*

If a mental health expert testified during Mr. Carter's penalty phase about the effect of risk and protective factors on Mr. Carter's life, the defense would have established the statutory mitigator of extreme mental or emotional disturbance. § 921.141(6)(b). Indeed the Florida Supreme Court has underlined the importance of this heavily weighted statutory mitigator, and how failure to present this mitigation can "constitute prejudicial ineffectiveness." *Hurst v. State*, 18 So. 3d 975, 1014 (Fla. 2009) (quoting *Rose v. State*, 675 So. 2d 567, 573 (Fla. 1996)).

A mental health expert who has knowledge of risk and protective factors could have testified to how the combination of Mr. Carter's neurological impairment, his personality disorder making him very impulsive, his rage from being abandoned by his father, his depression, abuse of alcohol and prescription

medicine, and his lack of sleep for thirty-six hours constituted a "toxic situation."

(Hr'g Vol. I 133-35). Dr. Gomez went on to describe further:

> [Mr. Carter] has the underlying neurological problem in the
> personality style and those things that he did what they do is they
> decrease his protective factors. When you drink alcohol, when you're
> sleep deprived it inhibits your brain processing. You don't think as
> well when you've been up 36 hours as you do when you've been up
> 10 hours, okay? You get deterioration. You add alcohol on top of
> that plus depression plus he's enraged because of a situation that
> ignites something in him then you have what we call a toxic situation.
> It's toxic because all these things come together.

*Id.* at 134-35. Dr. Gomez added his firm belief that Mr. Carter was under

the influence of an extreme mental or emotional disturbance at the time of the

murders. *Id.* at 139-140. This testimony would have established the statutory

mitigating factor of extreme emotional or mental disturbance.

Additionally, a mental health expert's testimony about Mr. Carter's risk and

protective factors could have shown that Mr. Carter's capacity to appreciate the

criminality of his conduct or to conform his conduct to the requirements of law

was substantially impaired. § 921.141(6)(f). Dr. Gomez, responding to the State's

assertion that Mr. Carter brought a gun to a home he knew to contain his girlfriend

and another man, explained that "[Mr. Carter] places himself in high-risk

situations. His thinking and him becoming disinhibited, the alcohol, his

neurological impairments, all those things, that's . . . the kind of thinking he has

when he's in that state." (Hr'g Vol. I 136). Dr. Gomez further concluded that Mr.

Carter's appreciation of his criminal conduct was substantially impaired. *Id.* at 140. Given these findings, the testimony of a mental health expert regarding risk and protective factors would have established the statutory mitigating factor of substantially impaired ability to appreciate criminal conduct or conform to the requirements of law.

Further, a mental health expert's testimony about the effect of risk and protective factors on Mr. Carter would have disproved the statutory aggravating factor of CCP with respect to Glen Pafford and Elizabeth Reed. In order to establish CCP, the State must prove that the following four factors existed: (1) the killing was the product of cool and calm reflection rather than an act prompted by emotional frenzy, panic, or a fit of rage (cold); (2) the defendant had a careful plan or prearranged design to commit murder before the fatal incident (calculated); (3) the defendant exhibited heightened premeditation (premeditated); and (4) the defendant had no pretense of moral or legal justification. *See Franklin v. State*, 965 So. 2d 79, 98 (Fla. 2007) (citing *Jackson v. State*, 648 So. 2d 85, 89 (Fla. 1994)).

From Dr. Gomez's findings, it is clear that counsel could have presented expert testimony at penalty phase to show that Mr. Carter's crime did not meet the requirements of CCP. Rather, a mental health expert like Dr. Gomez would have shown that Mr. Carter's actions were committed in an impulsive fit of frenzy,

panic, and rage, and were so spontaneous that Mr. Carter could not have had the requisite level of premeditation or prearranged design.   Given Dr. Gomez's diagnosis, and his testimony buttressing his belief that Mr. Carter was under an extreme emotional disturbance when he committed the crimes,[9] a mental health expert's testimony on risk and protective factors could have disproved the statutory mitigating factor of CCP.

3.     *Even if the Negative Evidence of Mr. Carter's Past Crimes Came Out in Front of the Jury, Mr. Carter Could Have Received a Life Sentence.*

The circuit court emphasized that if a mental health expert testified on Mr. Carter's behalf, the "worst kind of bad evidence would have come in with the good."   Therefore (according to the court), Mr. Carter was not prejudiced by counsel's deficiency because there is no reasonable probability that the outcome would have been different.   (Order 38-39 (citing *Bradley*, 33 So. 3d at 680-81; *Wong v. Belmontes*, 558 U.S. 15, 26-27 (2009))).   However, the court erred in making this determination.   After been convicted of three counts of first degree murder, could there have been anything worse?

Presenting an expert to testify about the effect of risk and protective factors on Mr. Carter's life would have revealed Mr. Carter's two prior crimes to a judge and jury, but any possible negative effect of these revelations would have been minimized because a neuropsychologist would have explained these prior crimes

---

[9] *See supra*, Part I.A.

as part of a pattern of conduct linked to neurological impairment and risk and protective factors.[10]

Further, in *Sears v. Upton*, 130 S. Ct. 3259 (2010), the U.S. Supreme Court stated that even though postconviction mitigation may reveal adverse information, this does not mean that the defendant was not prejudiced by a counsel's failure to find and present this mitigation at trial:

> The fact that along with this new mitigation evidence there was also some adverse evidence is unsurprising . . . Competent counsel should have been able to turn some of the adverse evidence into a positive— perhaps in support of a cognitive deficiency mitigation theory . . . This evidence may not have made Sears any more likeable to the jury, but it might well have helped the jury understand Sears, and his horrendous acts . . . .

*Id.* at 3263-64. The Court's language applies to Mr. Carter's case. Had counsel presented this evidence within the framework of risk and protective factors, the jury at penalty phase would have understood why Mr. Carter committed the acts that he did. The jury was sympathetic to Mr. Carter despite the complete lack of statutory mitigation, and despite the mitigation theory that Mr. Carter was a "nice person"—an argument counsel made without a concrete, scientific, rationale for the crimes Mr. Carter committed.

Counsel could have presented all the same witnesses in favor of the mitigation theory that Mr. Carter was a good person, and counsel could have

---

[10] Dr. Gomez testified that Mr. Carter's actions in his two past crimes were consistent with the neurological and psychological impairments that Dr. Gomez found. Hr'g Vol. I 158.

invoked the same sympathy from the jury that resulted in the close vote.  However, counsel was ineffective because they stopped there.  Though a mental health expert's testimony would have revealed Mr. Carter's past crimes, an expert would have minimized the impact of their revelation by presenting them within the framework of risk and protective factors, and providing a scientific explanation for why the past crimes occurred.

4.    *If Counsel Presented a Mental Health Expert at Penalty Phase to Testify About Risk and Protective Factors, Mr. Carter Would Have Received a Life Sentence*

When viewed in concert with the weak, non-statutory mitigation offered at Mr. Carter's penalty phase, had counsel presented an expert's testimony about Mr. Carter's neurological impairment and risk and protective factors, Mr. Carter would have received a life sentence.

"Penalty phase prejudice under the *Strickland* standard is measured by whether the error of trial counsel undermines this Court's confidence in the sentence of death when viewed in the context of the penalty phase evidence and the mitigators and aggravators found by the trial court." *Hildwin v. State*, 84 So. 3d 180, 187 (Fla. 2011) (citing *Stewart v. State*, 37 So. 3d 243, 253 (Fla. 2010)). In order to evaluate the prejudice inflicted upon a defendant because of counsel's failure to present mitigation, any additional mitigation presented during postconviction proceedings must be considered in concert with the mitigation

presented and proven at the penalty phase to determine whether the Court's confidence in the outcome is undermined. *Porter v. McCollum*, 558 U.S. 30, 40-1 (2009). The Florida Supreme Court has always emphasized that mental mitigation, if presented, can overturn a death sentence even in the face of statutory aggravation. *See Green v. State*, 975 So. 2d 1081, 1088-89 (Fla. 2008) (reversing death sentence despite aggravator of heinous, atrocious, and cruel); *Carter v. State*, 560 So.2d 1166, 1168-69 (Fla. 1990) (vacating death sentence based on defendant's neurological impairment, increased impulsiveness, diminished ability to plan events, and one psychologist's testimony that the defendant "probably" was unable to appreciate the criminality of his conduct).

The jury was sympathetic to Mr. Carter, and its sentencing recommendation reflected its sympathies. The jury recommended a life sentence for Courtney Smith's death; the death sentence by only a 9-3 vote for Glen Pafford's death; and the death sentence by only an 8-4 vote for Elizabeth Reed's death. *Carter*, 980 So. 2d at 479. The close jury vote was accomplished despite the weak, non-statutory mitigation offered in Mr. Carter's defense. Had counsel presented a mental health expert—along with the twenty-seven witnesses presented—counsel could have provided a scientific explanation for Mr. Carter's actions in addition to evidence supporting the theory that Mr. Carter was a good person who affected many people in a positive way. Mr. Carter's mitigation at penalty phase was "insubstantial,"

and counsel's failure to discover and present valuable mental mitigation in the form of expert testimony on risk and protective factors prejudiced Mr. Carter.

Because the State was seeking three statutory aggravators at penalty phase, Mr. Carter was prejudiced by his counsel's failure to seek even one statutory mitigator. Counsel could have presented powerful statutory mitigation. Dr. Gomez's testimony would have proven two statutory mitigating factors, including extreme mental or emotional disturbance, which this Court has "consistently recognized . . . is a mitigating factor of the most weighty order, and the failure to present it in the penalty phase may constitute prejudicial ineffectiveness." *Rose*, 675 So. 2d at 573.

In the State's closing argument in front of the jury at penalty phase, the prosecutor pointed out the vast difference in the statutory mitigation presented by the State, and the non-statutory mitigation presented by Mr. Carter's counsel. When asking the jury to recommend the death sentence for the death of Glenn Pafford, the prosecutor—after pointing out that the State had already proven two statutory aggravators—stated the following:

> [A]nd then number three is the crime for which the defendant is to be sentenced was committed in a cold and calculated and premeditated manner and without any pretense of moral or legal justification. So one aggravator like this is enough in terms of this weight, but what you have here in terms of just the murder of Glenn Pafford is you have actually on behalf of the State of Florida I will submit three separate aggravators. Look at just the first one. Doesn't that just by itself in terms of the murder of two other human beings

that [the defendant] has been convicted of, <u>doesn't that aggravation outweigh any mitigation that you've heard for the last few days?</u>

(R Vol. XXIII 2834-35) (emphasis added).  The prosecutor then exposed the weak

mitigation that Mr. Carter's counsel presented at penalty phase:

But that's what they want you to consider, that he had a terrible childhood.  So that is mitigation to consider.  There's no dispute that they've proven that.  How much weight do you assign to that?  And does that outweigh the aggravators in this case?  Does it outweigh <u>just even one of the murders?</u>  Does it outweigh the second?  Does it outweigh the third?  (R Vol. XXIII 2850) (emphasis added).

Using the standard in *Porter*, the difference between Mr. Carter's mitigation

presented at penalty phase and the mental mitigation available through a mental

health expert is staggering.  As in *Porter*, Mr. Carter was prejudiced by his

counsel's failure to uncover and present crucial mental mitigation.  Here, where the

jury's recommendation leaned only slightly in favor of death despite the complete

absence of mental mitigation, any kind of expert testimony to present arguments in

favor of statutory mitigation would have changed the outcome of Mr. Carter's

penalty phase.  A mental health expert's testimony about the effect of risk and

protective factors on Mr. Carter's life, when viewed in concert with the minimal

mitigation offered at Mr. Carter's penalty phase, must undermine this Court's

confidence in Mr. Carter's death sentence.

The circuit court found that Mr. Carter was not prejudiced by his counsel's

failure to present a mental health expert.  (Order 38-39).  However, the court's

reasoning for this decision illustrates the court's error. The court emphasized that there was a vast "body of aggravation" against Mr. Carter, but failed to address that counsel was ineffective for failing to present a mental health expert to disprove the statutory aggravator of CCP, an aggravator that the court itself—and this Court—stated is "one of the weightiest aggravators." (Order 38 (citing *Bradley v. State*, 33 So. 3d 664, 680-81 (Fla. 2010))). Had counsel presented this mental mitigation, counsel could have disproven the critical aggravator of CCP and taken a huge bite out of the "entire body of aggravation" that the court believed gave Mr. Carter no reasonable probability of a different sentence.

A penalty-phase presentation of two statutory mitigators and multiple non-statutory mitigators vs. two statutory aggravators[11] would have given Mr. Carter a different sentence, and saved his life. Mr. Carter's life is certainly not a game, but as in a game of soccer, when the score of statutory aggravation v. statutory mitigation stood at 3-0, everyone knew (including the court) what the result of Mr. Carter's penalty phase would have been: Death. However, at 2-2, the result would have been unclear, and this Court's confidence in the outcome of Mr. Carter's penalty phase must surely be undermined.

---

[11] If Mr. Carter's trial counsel had disproved the statutory aggravator of CCP through the testimony of a mental health expert and argued for the other two statutory aggravators, the trial court would have found two statutory aggravators and two statutory mitigators.

The lower court placed great emphasis on the U.S. Supreme Court's ruling in *Wong v. Belmontes*, finding that Mr. Carter was not prejudiced by his counsel's failure to present a neuropsychologist because the jury could have made "logical connections" without an expert, and the testimony would have "opened the door for rebuttal evidence regarding negative events in [Mr. Carter's] past." (Order 31, 37 (citing *Wong v. Belmontes*, 558 U.S. 15, 24 (2009))). However, the relevant language in *Belmontes* demonstrates that Mr. Carter's case is distinguishable:

> [T]he body of mitigating evidence [the expert would have presented] was neither complex nor technical. It required only that the jury make logical connections of the kind a layperson is well equipped to make. The jury simply did not need expert testimony to understand the 'humanizing' evidence; it could use its own common sense or mercy.

*Belmontes*, 558 U.S. at 24.

Here, as Dr. Gomez's testimony illustrates, an expert's testimony about risk and protective factors in Mr. Carter's case would have been scientific and complex, and would have presented evidence of Mr. Carter's neurological impairment and studies demonstrating how risk and protective factors shape an individual's life and decisions. A layperson cannot make logical connections when he or she is unaware of the science used to make the connections. Further, the potential rebuttal evidence in *Belmontes* was damning evidence indicating the defendant (convicted of murder) committed a prior murder. *Id.* at 17-18. Here,

though the incident with Mr. Carter's ex-wife was certainly serious, it was nowhere near as damaging.

The circuit court further stated that Mr. Carter's risk and protective factors were included in what defense counsel provided to the jury.   (Order 37). Admittedly, the jury did hear about Mr. Carter's upbringing and experiences, and an expert like Dr. Gomez did not learn anything new about Mr. Carter.  However, testimony about risk and protective factors was not provided to the jury, because risk and protective factors were not mentioned.  Without any correlation between Mr. Carter's experiences and the crimes, without any framework to make sense of his experiences and neurological issues, the testimony about Mr. Carter's terrible upbringing was only presented for the jury to "feel bad" for a man already convicted of murder for the deaths of three people.  Expert testimony about risk and protective factors would have put Mr. Carter's traumatic experiences and neurological impairment into a proper framework, and provided a correlation between those experiences and his crimes—to provide an explanation for why Mr. Carter committed the crimes he did. (Hr'g Vol. I 130). In essence, counsel threw the pieces of the psychological puzzle on the table without putting those pieces together to show the jury or court the full picture.

Further, Mr. Carter was prejudiced by defense counsel's failure to present a mental health expert's testimony at the *Spencer* hearing.  After the State presented

evidence to prove three statutory aggravators (and after the jury recommended death), there was no likelihood that a trial judge would consider Mr. Carter's non-statutory mitigation and give a life sentence because he or she "felt bad" or Mr. Carter.

Moreover, testimony about risk and protective factors could have presented another powerful argument in favor of a life sentence. The jury would have heard how Mr. Carter is a productive member of society when he is in "protective" environments with structure and rules.[12] (Hr'g Vol. I 142). This, along with Mr. Carter's clean disciplinary record since incarceration,[13] would have reinforced the argument for life in prison instead of death.

## CONCLUSION

When looked upon in totality, the number of errors and incorrect findings of the state courts that occurred throughout Mr. Carter's trial and subsequent appellate history cannot be viewed as harmless. As shown within, the rulings of the Florida Supreme Court were both in contrast to established federal law and unreasonable given the facts of the incident as presented at trial. Mr. Carter requests an evidentiary hearing on the claims set forth herein and/or vacating of the death sentence.

---

[12] Mr. Carter had a good military service record and was recommended for reenlistment before leaving the United States Air Force early to attend college. Order 32. Mr. Carter also stayed out of trouble, participated in many student organizations, and developed many positive relationships during his time at Oklahoma State University. *Id.*

[13] Mr. Carter has not had a discipline problem in prison in the last ten years. (Hr'g Vol. I 142).

Respectfully submitted,
**TASSONE & DREICER, LLC**

/s/ Frank J. Tassone
FRANK J. TASSONE, ESQUIRE
Bar No. 165611
1833 Atlantic Boulevard
Jacksonville, Florida 32207
P: 904.396.3344
F: 904.396.3349
Email: frank@tassonelaw.com
ATTORNEY FOR PETITIONER

## CERTIFICATE OF SERVICE

   **I HEREBY CERTIFY** that copies of the foregoing have been furnished to

the U.S. District Court, Middle District of Florida, Jacksonville Division, in

Jacksonville, Florida,  Bernie De La Rionda at brio.dala@col.net, and Charmaine

Millsaps at charmaine.millsaps@myfloridalegal.com  by electronic filing on the

CM/ECF system this 7th day of October, 2015.

/s/ Frank J. Tassone
FRANK J. TASSONE, ESQUIRE

33